Tucker, P.
after examining the question, upon the evidence, as to the credit claimed by Garrett for the 2000 dollars paid by him to Carr, and shewing the reasons why this court held the chancellor’s decree clearly erroneous, in disallowing that credit and adjudging that Garrett should pay that sum to the legatees, proceeded—
With respect to the other part of the case, I think there is yet less doubt, that the decree is erroneous. The bill was filed by the children of Richard Allen against his ex *412 ecutors, for the purpose of scrutinizing before the court of chancery, one of those ex parte accounts, which, instead of settling disputes among the members of a family, most generally-prove the proximate cause of diséord and litigation. accounts with incorrectness, and surcharged and falsified them, in several particulars. It was not a stale and antiquated transaction, raked from oblivion by some speculating busy body and maintainer of suits, but an appeal for redress of their supposed wrongs, by two young people but recently arrived at maturity, and within six months after the recording of that account, which they assailed as derogatory from their rights. They were then entitled to be heard, if they could shew any just ground of complaint. It is proved, indeed, that Carr, the husband of one and the guardian of the other infant, attended the settlements, and was repeatedly invited to object to what he thought amiss. In answer to this, it is sufficient to say, that that attendance, if it had continued during the whole of the settlement, would not have been conclusive of the rights of the parties. But it may be added, that neither of the distributees nor the plaintiff Carr were present during the whole time, and particularly at the last meeting which was most important, and presented the results of the examinations of the commissioners ; and moreover, though present, if they were without counsel, this court would not necessarily infer, that they were competent to the detection of the errors, which, in the settlement of an executor’s account, may escape even the most practised eye.
The question before the chancellor as to this matter, was, Whether the proceedings in the cause presented a case for the reference of the accounts to a commissioner for settlement, upon the ground, that they were surcharged or falsified, by the bill and the evidence adduced by the plaintiff. The chancellor thought not. Let us inquire into it.
Passing by the small items for managing the estate, and for board, in -which the plaintiffs have not succeeded, there is one item in the account obviously mis-stated, besides the *413 2000 dollars for which Garrett claimed credit which was rejected (improperly as I have already shewn) by the chancellor. I speak of the 2000 dollars paid over by Garrett to Minor in December 1810, and not credited by Minor until January 1811. By this means one year’s interest was lost, as interest was not calculated upon that sum but from December 1811. For this interest the executors are beyond question liable : but who can say upon which of them the burden ought to fall ? To the plaintiffs, indeed, it is immaterial, provided they get their right; but the chancellor has not given it to them, although the falsification was distinctly set forth in the bill, and palpable upon the accounts of the parties. This error so undeniable, and yet so inexplicable that Minor frankly says he cannot explain it, of itself demanded that the accounts should be remodeled. Occurring as early as 1811, it affected the results of the subsequent transactions, and moreover it was a matter which ought to have been settled before the bill was dismissed as to Minor.
But the account was not only erroneous in this glaring particular, but it was grossly erroneous upon its face, in its principles and its details. In examining it, it must be observed we exercise no other than our legitimate appellate jurisdiction. The chancellor has said no new account was necessary. In reviewing this opinion, we must place ourselves in his situation, and do what he should have done. Now, I lake it, wherever a case is presented before a court of chancery to surcharge and falsify an executor’s account, though the plaintiff is held to a specification of items of surcharge or falsification, yet it is always competent to him, or to his counsel, to shew to the chancellor, that upon its face the account is erroneous; that it is stated upon principles in conflict with the rules of the court, and subversive of the rights of the parties. Not controverting the items themselves, he may shew that they have been so arranged, as to produce by the magic of figures, results the most fatal to his rights. In this case, I think, we find an instance of *414 such an operation. But to understand the injury done to . , the plaintiffs in its full extent, we must advert first to the will of the testator,
" Richard Allen by his will directed his lands and other property, except slaves, to be sold, and the amount of sales to be laid out in Virginia hank stock, or in such other property as his executors should think most advantageous to his children. Admitting the discretion here vested in the executors, in its largest scope, and admitting (what, by the way, the evidence decidedly negatived)' that the investment in bank stock as directed, would not have been judicious, the question recurs as to the course the executors ought to have pursued. Their great and avowed anxiety to meet the wishes of the testator, to do what they think he would have done, was highly meritorious. They have speculated, in their answers, on the different modes of employing the capital in their hands, but have not succeeded in shewing what, besides the bank investment, the testator probably wished. But though it may be difficult to divine what he did wish, except so far as that wish is evinced by directing a bank investment, there can be no difficulty in saying what he did not wish. He could not have wished, to sell his lands and other property, the natural fund for the support and education of his children, and to invest the proceeds in such a way that the maintenance and support of those children should, like a consuming moth, eat up the principal of his estate, and leave the interest, during a long minority, a barren fund in the hands of his executors, producing no profit and meeting no expenditure. He could not have wished to pursue a system, the inevitable effect of which was to sink a great part of an estate, the annual profits whereof would have amply met all demands for maintenance and education, and left an accumulating balance. Why did he sell the land, in the stability of which he might safely have confided ? Because he confided not less in the faithful promotion of his views by his executors; and because thosé views were to convert a sluggish into an active *415 capital. Hence ho directs an investment into bank stock, the dividends of which would be applied, with the hires of his slaves, to the maintenance and education of his children, and the balances to reinvestments. The effect of this operation would have been, to have accumulated, at this hay, no trifling sum, instead of that which they have received. But the executors, in the exercise of their discretion, have declined taking bank stock, and the chancellor has considered them as justified in that course. If, however, they did not choose to pursue the direction of the testator, it was proper that they should come as near to it as might be, and that the court at least should take care, that, in the exercise of their discretion, the testator’s views and intentions shall not be utterly frustrated. They might have vested the funds as they w'ere received (and it was the natural course of things) in loans to good borrowers, securing the payment of interest regularly, to meet the expenses of the children, and to be reinvested as occasion might serve. They have not done this, except as respects that portion of the funds which were permitted to remain in the hands of JVatson (the purchaser of the lands) who sometimes paid the interest, which was then converted into principal. A similar course as to the residue of the estate, would have produced very different results from those now exhibited. Indeed, it would seem by Garrett’s answer, that they deemed it best, that the money should lie in the hands of responsible and punctual men upon simple interest. If this, then, was the course to be pursued, it should appear that the money was so let out upon loan; unless we are to understand them as meaning, that it was safer for them to retain the money themselves. If they did so, then they must be considered as retaining it as borrowers; and not holding it as executors merely, chargeable with interest upon the principles applicable to such fiduciaries. In this view, they should, in this account, have been annually charged with interest, for such would have been the effect had the money been lent to others; and that interest should have been applied to the *416 disbursement of expenses, and the excess reinvested in an interest bearing capital. For, in this case, the ordinary principles which govern the accounts of executors, do not apply. Quoad this matter, they are not to be treated as executors. They are ordinary debtors—borrowers of this money—which they admit should have been put out and improved at interest in the hands of punctual men. The case of Granberry v. Granberry, 1 Wash. 246. does not govern their case. The court, there, forbad a certain mode of stating executors’ accounts, because it said, “though right in the ordinary case of debtor and creditor, it would be hard in the case of an executor.” Here, the executors substituting themselves as borrowers, the ordinary principles of debtor and creditor, have strict application.
But it is not for these reasons only that the account should be otherwise stated. In this case the estate owed but a single small debt. Did that justify the protraction of the ex-ecutorial account from 1805 to 1824 ? By no means. Ex-ecutorial accounts should always be brought to a close as soon as the debts are paid, and the transactions permit. Payments to legatees, and advances to children or other distributees, should never enter into the general account, both to prevent confusion, and because the accounts with them are not to be adjusted upon the principle of the general account. For, after the balance of the general account is struck, and the portions of the several legatees or distributees ascertained, the account between them and the executor is strictly an account between debtor and creditor. When such balance is struck, the portion of each should be carried to a separate account with him individually. The executors in this case, indeed, would still have held the funds in their hands by virtue of the will, until the marriage or maturity of the children. But the accounts of the fund so held by them, would not have been adjusted on the principle of an executor’s account. They would have been treated rather as guardians, who are never permitted to pay the infants’ expenses out of the principal of their estate. *417 One of the parties seems to have been the actual, though not indeed the legal guardian of the children; and he who so acts, ought to be charged as such. Whoever enters upon an infant’s estate, is treated as his bailiff or guardian, and charged accordingly. Bennet v. Whitehead, 2 P. Wms. 644. Dormer v. Fortescue, 2 Atk. 288. 3 Id. 124. S. C. Much more, where an executor undertakes to fulfil the duties of guardian, instead of having a guardian appointed according to law, he must be treated as such, in his transactions with the infant. Indeed, even were it otherwise, it is absurd to suppose, that he can be justified in doing that which even the legal guardian cannot do. It is absurd to suppose, that he can lawfully waste the principal of the infants’ estate, when the lawful guardian would not be permitted to do it. Nay, it is for his own benefit to consider him as sustained in his acts, as quasi guardian. If.he bo not, then all these payments and disbursements for the wards would be in his own wrong. Hence, in tenderness to him, and because he has only done that which benevolence required for an unprotected child, he is justified in doing what the guardian might do; but upon no principle is he justified in doing more. His disbursements, therefore, must be charged to the interest, and not to the principal, of the wards’ estate. And herein this account is wrong ab ovo usque ad mala.
If the executors were themselves fairly borrowers of the funds, in the execution of their trust, I do not know that the distributees could complain of any profit they may have made. If they were borrowers of the funds, substituting themselves for, and to account as, other borrowers would, if they held the funds as debtors of the estate, and were accountable as ordinary debtors, then they had a right to make what profit they could from those funds.
It is unnecessary to pursue this subject farther. I will only add, as to the dismissal of the bill, that the original bill was dismissed as to both the parties, in relation to all matters except the sum of 2000 dollars decreed against Gar *418 rett. Garrett having appealed from the decree for the 2000 dollars, and the decree as to that being reversed, and the court perceiving also error in the record against the appellee, is bound, according to its rules, to consider the whole rec°rd, and to correct that error also, as if the appellee had appealed. It struck me, at first, that as Minor was out of court by the dismissal of the bill, this court could only correct errors as against Garrett. But one of the errors is the dismissal of the bill as to all other matters except the 2000 dollars. This dismissal, therefore, as to Garrett, must be set aside. But as the order of dismissal was intire, embracing both,—the reversal of that order must be a reversal as to both. Indeed, the two executors are so connected in the transactions, that this seems inevitable : and the case thus comes within the distinction, as I understand it, taken by the court in Tate v. Liggat, 2 Leigh, 107, 8.
. The other judges concurring, the decree was reversed, and the cause remanded, in order that the executors’ accounts might be remodeled and corrected, according to the principles indicated in the opinion of the president.